# CIRCUIT COURT OF HENRICO COUNTY

Short Pump Town Center
Community Development
Authority et al.

v.

Taxpayers et al.

February 13, 2001

Case No. CL-1636

BY JUDGE RANDALL G. JOHNSON

This action is brought under the Public Finance Act of 1991, Va. Code §§ 15.2-2600 *et seq.* At issue is whether the County of Henrico, acting through the Short Pump Town Center Community Development Authority ("Short Pump CDA" or the "CDA"), may legally issue special assessment bonds to finance the acquisition, design, construction, and development of certain improvements relating to a private shopping mall.

The shopping mall in question, which will be called the "Short Pump Town Center," has not yet been built. It will be developed by Short Pump Town Center, L.L.C., a private entity, and will be located near the intersection of West Broad Street and Lauderdale Drive in western Henrico County. It will be anchored by four department stores: Dillard's, The Hecht Company, Lord & Taylor, and Nordstrom. It will take up approximately 1,000,000 square feet and will be what is known in the industry as a "super-regional, high-end mall."

As a result of negotiations between the developer and County officials over incentives to be offered by the County to encourage the developer to build the mall in Henrico, and pursuant to Va. Code § 15.2-5153, the developer petitioned the County to create a community development authority

"to finance and construct certain public improvements" in connection with the proposed mall. The creation of such an authority is authorized by the Virginia Water and Waste Authorities Act, Va. Code §§ 15.2-5100 *et seq*. Specifically, § 15.2-5155(A) provides, in pertinent part:

> Any locality authorized to consider petitions under this article may, by ordinance or resolution not inconsistent with the petition proposing the creation of the authority, create a community development authority.

Section 15.2-5158(A) provides, again in pertinent part:

> Each community development authority created under this article, in addition to the powers provided in Article 3 (§ 15.2-5110 *et seq*.) of Chapter 51 of this title, may:
>
> 1. Subject to any statutory or regulatory jurisdiction and permitting authority of all applicable governmental bodies and agencies having authority with respect to any area included therein, finance, fund, plan, establish, acquire, construct or reconstruct, enlarge, extend, equip, operate, and maintain the infrastructure improvements enumerated in the ordinance or resolution establishing the district, as necessary to meet the increased demands placed upon the locality as a result of development within the district, including, but not limited to:
>
> a. Roads, bridges, parking facilities, curbs, gutters, sidewalks, traffic signals, storm water management and retention systems, gas and electric lines and street lights within or serving the district which meet or exceed the specifications of the locality in which the roads are located.
>
> b. Parks and facilities for indoor and outdoor recreational, cultural and educational uses; entrance areas; security facilities; fencing and landscaping improvements throughout the district.
>
> c. Fire prevention and control systems, including fire stations, water mains and plugs, fire trucks, rescue vehicles and other vehicles and equipment.
>
> d. School buildings and related structures, which may be leased, sold or donated to the school district, for use in the educational system when authorized by the local governing body and the school board.

e. Infrastructure and recreational facilities for age-restricted active adult communities, and any other necessary infrastructure improvements as provided above, with a minimum population approved under local zoning laws of 1,000 residents. Such development may include security facilities and systems or measures which control or restrict access to such community and its improvements.

2. Issue revenue bonds of the development authority as provided in § 15.2-5125, including but not limited to refunding bonds, subject to such limitation in amount, and terms and conditions regarding capitalized interest, reserve funds, contingent funds, and investment restrictions, as may be established in the ordinance or resolution establishing the district, for all costs associated with the improvements enumerated in subdivision 1 of this subsection. Such revenue bonds shall be payable solely from revenues received by the development authority.

Among the improvements contained in the developer's petition are the extension of a sewer trunk line, extension of a water main line, storm water management facilities, a left turn lane and traffic signal on a road abutting the mall, a "ring road" that will encircle the mall, entrance roads, lighting, landscaping, a plaza, parking, and excavation. The estimated cost of the improvements to be financed through the community development authority is $22,000,000. The total cost of the project is $236,000,000.

At a regularly scheduled meeting of the County's Board of Supervisors on September 26, 2000, the Board, stating that "assist[ing] in financing certain improvements in connection with the Short Pump Town Center will benefit the citizens of the County by promoting increased employment opportunities, a strengthened economic base and increased tax revenues and additional retail opportunities not currently available in the local area," adopted a resolution granting the developer's petition and creating the Short Pump CDA. The resolution contained the following language:

3. *Facilities and Services.* The CDA is created for the purpose of exercising the powers set forth in the [Virginia Water and Waste Authorities] Act, including financing, constructing and developing, and owning and maintaining if necessary, certain improvements in connection with the development of a shopping center as described in the Petition and the Articles of Incorporation. The CDA shall have all the powers provided by the Act.

The "Petition" referred to in the resolution is the petition of the developer already discussed. The "Articles of Incorporation" are the articles of incorporation of the Short Pump CDA, which are attached as Exhibit B to the resolution. Article VI of the articles of incorporation, titled "Purposes and Powers," provides:

> The Authority is organized for the purpose of exercising all powers granted by the [Virginia Water and Waste Authorities] Act, including financing, funding, planning, establishing, acquiring, constructing or reconstructing, enlarging, extending, equipping, operating and maintaining improvements serving or associated with the development of a shopping center and related improvements known as Short Pump Town Center. The Authority shall have all powers granted to a "community development authority" under the Act.

On October 20, 2000, the Short Pump CDA adopted a resolution authorizing the issuance of bonds in the maximum principal amount of $25,000,000 to finance the improvements set out in the developer's petition. The resolution also authorized a special assessment to be levied within the Short Pump CDA District to secure the bonds and requested the Board of Supervisors to levy the assessment. The Board of Supervisors adopted an ordinance establishing the special assessment on October 24, 2000. The ordinance referred to a Memorandum of Understanding among the Board, the landowner,[1] the developer, and the Short Pump CDA. The Memorandum of Understanding contains the following language:

> 3. Development of CDA Improvements. The Short Pump Town Center will be a first-class retail center located within the Initial Authority District. The CDA Improvements consist of various infrastructure improvements, including traffic signalization and road improvements, entrance roads, sanitary sewer line improvements and extensions, stormwater management improvements, water system extensions and improvements, lighting, landscaping, parking and public areas all as described in the petition. The CDA, or the Developer on behalf of the CDA, will enter into contracts for the construction, development and equipping of such improvements.

---

[1] Although the subject property is titled in different names, the landowner is, for all practical purposes, the developer.

The October 24 ordinance also approved an Economic Development Agreement (the "EDA Agreement"). Together, the Memorandum of Understanding and the EDA Agreement contain the terms for repayment of the bonds. Pursuant to those documents, the bonds are to be paid with monies collected in special assessments levied on the property within the Short Pump CDA District; that is, the mall. Such special assessments are to be paid by the developer to the Short Pump CDA semiannually. The Short Pump CDA will then reimburse the developer on a dollar-for-dollar basis by paying the amount of each special assessment to the Economic Development Authority of Henrico County, Virginia (the "EDA"), a public body created under the Industrial Development and Revenue Bond Act, Va. Code §§ 15.2-4900 *et seq*. The EDA will then pay the reimbursement to the developers or, at the developers option, directly to the Short Pump CDA in satisfaction of the next special assessment payment due. In other words, with the exception of the first special assessment payment due from the developer, all of the payments required to be made by the developer will be paid, if the developer chooses, directly out of the tax revenues generated by the mall. With the collection of the last semiannual assessment, even the first payment by the developer will be reimbursed. The bonds are to be fully repaid in five years.

The statutorily mandated public hearing and referendum have been held. *See* Va. Code §§ 15.2-2606 *et seq*. The present suit was filed on November 16, 2000, and is brought pursuant to Va. Code § 15.2-2651. That section provides:

> The governing body of any locality or other political subdivision, agency or instrumentality of the Commonwealth proposing to issue bonds may bring at any time a proceeding in any court of the county or city having general jurisdiction and in which the issuer is located to establish the validity of the bonds, the legality of all proceedings taken in connection with the authorization or issuance of the bonds, the validity of the tax or other means provided for the payment of the bonds, and the validity of all pledges of revenues and of all covenants and provisions which constitute a part of the contract between the issuer and the owners of the bonds. The proceeding shall be brought by filing a motion for judgment describing the bonds and the proceedings taken in connection with their issuance and alleging that the bonds when issued shall be valid and legal obligations of the issuer. In the motion for judgment the taxpayers, property owners and citizens of the jurisdiction where the issuer is located, including nonresidents owning property in or subject to taxation by it, and all

other persons interested in or affected in any way by the issuance of the bonds shall be made parties defendant.

Virginia Code § 15.2-2654 provides:

> Any party defendant may reply to the motion for judgment within ten days after its second publication as required by §§ 15.2-2652 and 15.2-2653 but not thereafter. Any property owner, taxpayer, citizen or other person in interest may become a party to the proceedings by pleading to the motion for judgment on or before the time set for hearing as provided by § 15.2-2652 or § 15.2-2653, or such earlier time as may be specified in the order of the court, or thereafter by intervention upon leave of the court. At the time and place designated in the order for the hearing as provided for in § 15.2-2652 or § 15.2-2653, the judge shall proceed to hear and determine all questions of law and fact in the proceeding and may make such orders as to the proceeding and such adjournments as will enable the judge properly to try and determine the proceeding and to render a final decree with the least possible delay. The proceeding shall take precedence over all other business of the court.

By order entered December 8, 2000, the Board of Supervisors and the EDA were allowed to intervene as parties plaintiff. Three taxpayers, Arlie A. Hahn, Jr., Bryan B. Gresham, and Robert Anderson (collectively, the "Taxpayers"), filed grounds of defense, as did Taubman Limited Partnership ("Taubman"), which owns Regency Square, an existing shopping mall in Henrico County. Taubman also filed a separate chancery suit against the Short Pump CDA and the EDA challenging the issuance of the bonds and the repayment plan set out in the Memorandum of Understanding and the EDA Agreement. The two actions were consolidated by order entered December 15, 2000, although they were subsequently severed for trial. After a hearing on January 5, 2001, the Honorable George F. Tidey, the judge to whom both cases were assigned, recused himself from the law action. On January 9, 2001, the Chief Justice of Virginia designated the undersigned to preside over the law case. A trial was held on January 31 and February 1.

The pleadings filed by the Taxpayers and by Taubman challenge the proposed bond issue for a variety of reasons. At trial, however, the Taxpayers' challenge was narrowed to two grounds. First, the Taxpayers argue that Va. Code § 15.2-5158 does not authorize a community development authority to finance the types of improvements contemplated at the Short Pump Town

Center. Second, the Taxpayers claim that Va. Code § 15.2-4905 does not give the EDA the authority to act as a "conduit" for the payment of funds from the County to the developer or from the County to the Short Pump CDA, which is the payment plan contemplated under the EDA Agreement.

Taubman's challenges were also narrowed at trial. While joining the Taxpayers' challenges as just stated, Taubman also argues that the bonds violate numerous provisions of the state and federal constitutions. Specifically, Taubman argues that the County, the Short Pump CDA, and the EDA acted arbitrarily and capriciously and in a manner that primarily serves the private interests of the Short Pump Town Center developers without any benefit to the taxpayers of Henrico County, and that the government entities just mentioned decided to take such action based on inaccurate data and before critical components of the bond transaction had been finalized, without unbiased, independent expert advise regarding the feasibility of the project and the costs and risks to the taxpayers and the necessity of providing incentives, and before the plans of development had been approved and traffic safety problems resolved. Finding that the proposed bond issue violates the express language of Va. Code § 15.2-5158, the court holds that it is invalid.

Before discussing the reasons for the court's ruling, it is important to note those factors which the court finds do not invalidate the proposed bond issue. First, the court rejects the Taxpayers' argument, joined in by Taubman, that the financing arrangement contemplated by the Memorandum of Understanding and the EDA Agreement is not permitted by Va. Code § 15.2-4905. Section 15.2-4901, which is titled "Purposes of Chapter," contains the following language:

> It is the intent of the legislature by the passage of this chapter to authorize the creation of industrial development authorities by the localities in this Commonwealth so that such authorities may acquire, own, lease, and dispose of properties and make loans to the end that such authorities may be able to promote industry and develop trade by inducing manufacturing, industrial, governmental, nonprofit and commercial enterprises and institutions of higher education to locate in or remain in this Commonwealth and further the use of its agricultural products and natural resources, and to vest such authorities with all powers that may be necessary to enable them to accomplish such purposes, which powers shall be exercised for the benefit of the inhabitants of the Commonwealth, either through the

increase of their commerce, or through the promotion of their safety, health, welfare, convenience or prosperity.[2]

Section 15.2-4905(10) gives economic development authorities the power:

> To exercise all powers expressly given the authority by the governing body of the locality which established the authority and to establish bylaws and make all rules and regulations, not inconsistent with the provisions of this chapter, deemed expedient for the management of the authority's affairs.

Here, the power to participate in the financing scheme complained about by the Taxpayers and Taubman was expressly given to the EDA by the Henrico Board of Supervisors, the governing body that created it. Moreover, such scheme is unquestionably designed to develop trade by inducing commercial enterprises to locate or remain in the Commonwealth. While such financing scheme may not be specifically set out in the other provisions of § 15.2-4905, the court finds that it is allowed under the broad language quoted above.

Next, the court disagrees with Taubman's argument that the bond issue is invalid because the bonds will primarily serve the private interests of the Short Pump Town Center developers without any benefit to the taxpayers of Henrico County. To the contrary, the Board of Supervisors specifically stated in the resolution creating the Short Pump CDA that the County's financing of the improvements at issue "will benefit the citizens of the County by promoting increased employment opportunities, a strengthened economic base and increased tax revenues and additional retail opportunities not currently available in the local area." Evidence of such benefits was presented at trial, as was evidence that if the County had not taken the action it did, there was a real possibility that the mall in question, or a similar mall, would be developed in the City of Richmond. Since all the parties agree that the Richmond metropolitan area can only support one such mall, losing this one to Richmond would deprive the County of the tax revenue, employment opportunities, and the other benefits cited by the Board in its resolution. There was also evidence to indicate that, while Regency Square will lose 25% of its business to the Short Pump Town Center, it will lose 50% of its business if a

---

[2] Although § 15.1-4901 refers to "industrial development authorities," § 15.1-4903 allows Goochland and Henrico Counties to call their authorities "economic development authorities."

comparable mall is built at Stony Point in Richmond, the site contemplated for such a mall at various times by the Short Pump developer and by Taubman. While reasonable people can disagree on the extent of benefits Henrico County will realize as a result of the development of a super-regional, high-end shopping mall at Short Pump, it is obvious to the court that some benefit will accrue. Since decisions such as this are the province of legislatures and not the courts, the court will not attempt to second-guess Henrico's Board of Supervisors to determine whether the Board's decision is consistent with what Taubman feels, or even what the court feels, is best for Henrico County.

Similarly, the court rejects Taubman's argument based on what Taubman considers was a failure of the Board to seek independent expert advise regarding the feasibility of the project and the costs and risks to the taxpayers, including the necessity of providing incentives. In this regard, Taubman presented evidence that lawyers and other professionals who had represented or otherwise assisted the Short Pump Town Center developer in developing plans for the project had also originally represented or otherwise assisted the Short Pump CDA. In fact, this action was originally filed on behalf of the Short Pump CDA by attorneys who had also represented the developer. They have since been replaced by other counsel. In any event, the Board of Supervisors and the Short Pump CDA knew with whom they were dealing. Any conflict of interest was a known conflict of interest. Moreover, whatever conflict exists or existed is of no consequence. While Virginia's State and Local Government Conflict of Interests Act, Va. Code §§ 2.1-639.1 *et seq.*, generally prohibits state and local officers and employees from transacting business with the agency, department, or other governmental body for which they work, that Act does not proscribe the conduct complained about by Taubman. Nor does any other law. While reasonable people may again disagree about the wisdom of the Board's action, there simply is no prohibition against it.

The court also rejects Taubman's argument that the Board of Supervisors and the Short Pump CDA made their decisions based on inaccurate data. The court knows of no law mandating what information a board of supervisors or community development authority must consider before passing laws or issuing bonds, and the court certainly has no authority to dictate such a mandate. Taubman's real complaint is that the Board's legislative action in creating the Short Pump CDA and approving the proposed bonds is unwise. Indeed, the majority of its evidence at trial was devoted to demonstrating that the development of the Short Pump Town Center generally, and the County's assistance in financing part of that development specifically, are bad business decisions that will be economic disasters. The Board of Supervisors and the

CDA presented evidence to show that the development will be a resounding success that will bring more jobs, tax revenue, and other businesses into the County. The Board of Supervisors and the CDA may be right. Taubman may be right. The court does not know. Nor does it make a difference. The wisdom of the Board of Supervisors' decision is not the issue before the court. Under our system of government, courts do not serve as "super-legislatures" that sit in judgment of the wisdom of legislative action. Only when legislatures act in violation of law do courts intervene. The Board of Supervisors' legislative decision based on the data it chose to consider, even if that data is contrary to what Taubman and others believe is accurate, is not a violation of law. It forms no part of the court's decision.

The court also makes no finding on whether it was necessary for the County to give the developer incentives in the form of a bond issue in order to have the project built in Henrico County. As with the matters already discussed, the decision concerning incentives is purely a legislative function. The court has neither the authority nor the inclination to be a part of it.

Lastly, the court rejects Taubman's argument that the bond issue is invalid because too many details have not yet been decided. While the court agrees that it is curious that so many items have still not been decided — for example, who will own the improvements after they are built — the court can find nothing in the statutes that requires such matters to be decided before the bonds are approved. The court is confident that if the bonds are issued, all actions by the Board, the Short Pump CDA, and the developer will be in accordance with law, including ownership of the improvements. With particular regard to the last point, the court is unable to find anything in the statutes that requires that improvements funded or constructed by a community development authority be the property of such authority. Apparently, the General Assembly has not imposed such a requirement legislatively. The court cannot impose such a requirement judicially.

Turning now to the reason the bond issue cannot be approved, Va. Code § 15.2-5158, already set out above, allows a community development authority to do a variety of things with regard to "infrastructure improvements," but only if certain criteria are met. Specifically, the relevant language of the statute allows a community development authority to "finance, fund . . . and maintain the infrastructure improvements enumerated in the ordinance or resolution establishing the district, as necessary to meet the increased demands placed upon the locality as a result of development within the district. . . ." According to the Taxpayers and Taubman, the quoted language sets out a six-part test before a community development authority can do any of the things allowed in the rest of the statute. Specifically, there

must be "[1] infrastructure improvements [2] enumerated in the ordinance or resolution establishing the district [3] as necessary [4] to meet the increased demands [5] placed on the locality [6] as a result of development within the district." The Taxpayers and Taubman contend that with the exception of the first element, the test has not been met. While the court does not agree that the statute needs to be broken down into six parts as suggested, it does agree that the criteria set out in the statute have not been met.

Contrary to the argument of the Taxpayers and Taubman, the court finds that the improvements to be financed through the bonds have been sufficiently enumerated in the resolution creating the community development district. The resolution adopted by the Board of Supervisors on September 26, 2000, which created the CDA, defines the improvements as those "described in the Petition and the Articles of Incorporation." The court holds that § 15.2-5158's requirement that the improvements be enumerated in the resolution allows such enumeration to be made by reference to other documents. And while the petition and articles of incorporation referred to in the resolution do not state every detail of the improvements contemplated, they do, in the court's opinion, provide a description sufficient to satisfy § 15.2-5158. For example, the petition lists as an improvement "lighting." The Taxpayers and Taubman complain that the specific type of lighting is not listed. The court holds that it does not have to be. Nor does the resolution or documents referred to in the resolution have to state the type of landscaping, roads, parking facilities, or other improvements contemplated to be financed by the bond issue. The descriptions provided are adequate to satisfy the requirement that such improvements be "enumerated."

The rest of the criteria are not met. In order for a community development authority to do any of the things allowed by § 15.2-5158 with regard to infrastructure improvements, such action must be "necessary to meet the increased demands placed upon the locality as a result of development in the district." With the exception of a proposed left turn lane and traffic signal on West Broad Street, none of the contemplated improvements are necessary to meet any increased demands placed upon Henrico County. They are improvements necessary or useful to operate a shopping mall or to make the shopping mall more attractive. In fact, with the exception of the left turn lane and traffic signal, all of the improvements will be located on mall property. Specifically, all of the lighting, landscaping, parking, extensions of water and sewer lines, stormwater management facilities, entrance roads, and excavations will be located on property owned by the developers, not by the County or the CDA. Even the "ring road," which will be a paved road encircling the mall with access to county roads, will be on mall property. In

reality, what the County and developer are proposing is public financing of improvements to meet the demands and desires of a private developer, not the demands of Henrico County. Such action would be no different than issuing bonds to pay for a private homeowner's garage, or bathtub, or shrubbery. They are all useful or necessary items that meet the demands of the individual homeowner. They do not meet any "increased demands placed upon the locality."

In summary, the court agrees with the Board of Supervisors and the CDA that the Board has enormous power in determining what is in the public interest and what is best for Henrico County. Such power has been recognized throughout this opinion. The Board and the CDA do not have the power, however, to authorize and approve a bond issue to fund infrastructure improvements that are not necessary to meet the increased demands of Henrico County as a result of development within the Short Pump CDA. Because the court finds that the improvements contemplated in this case, with the exception of the left turn lane and traffic signal on West Broad Street, are not necessary to meet such demands, but are only necessary or useful to meet the demands and desires of one private developer, the proposed bond issue is invalid.